IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                     No. 10 CR 2604 MV

JAIME C. NERIS,

       Defendant.

**ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS PHYSICAL EVIDENCE**

THIS MATTER came before the Court on Defendant's Motion to Suppress Physical

Evidence (Doc. 27).  The Court conducted a hearing on this motion on May 10, 2011, and

allowed the parties to file supplemental briefs until May 16, 2011, which the parties declined to

do.  The Court has considered the parties' briefs, arguments, relevant law and evidence.  After

being fully advised of the premises therein, the Court finds the motion is without merit and

should be DENIED for the reasons stated herein.

## I. FACTUAL BACKGROUND

On August 26, 2010, at approximately 9:30 or 10:00 a.m.,  Mr. Neris entered the Gallup

Port of Entry in McKinley County, New Mexico, driving a commercial tractor trailer.  Motor

Transportation Inspector Kenneth Homer initially met Mr. Neris and began the process of selling

him a required New Mexico tax I.D.   Inspector Homer then began to conduct a routine Level 2

safety inspection of Mr. Neris's vehicle.  Inspector Homer described a Level 2 inspection as

"consist[ing] of the driver's paperwork, a walk around of the outside of the vehicle, a check of

the interior of the cab, and a check of the cargo for securement and verification." Tr. at 13.[1]
Inspector Homer further stated that verifying the securement of the load and the cargo was
required by federal and state law. Tr. at 13-14. Inspector Homer requested and received Mr.
Neris's log book, which he reviewed briefly. He also received a second log book for an unlisted
co-driver, Jose Vasquez. Tr. at 14; *see* tr. at 52. At this point, Inspector Homer had to leave due
to another commitment, and therefore turned over the inspection to Officer Hermilo Lucero to
complete.

 Officer Lucero testified that he began his inspection by reviewing Mr. Neris's logbook.
He observed that Mr. Neris initially spent some time off in Philadelphia, where Officer Lucero
believed he resided. Mr. Neris then traveled from Pennsylvania to California using a "constant
driving pattern, where he would drive the legal amount of hours, then he'd take his time off" and
continue in that manner for several days. Tr. at 21. Officer Lucero described this pattern as
"normal" for truck drivers. *Id.* Once Mr. Neris arrived in California, he spent one day off duty
in Ontario, picked up his load in Rancho Dominguez before noon the following day, and then
returned to Ontario where he spent the remainder of the day off duty again. Officer Lucero
found it "strange" that Mr. Neris would spend another half day off duty after receiving his load
because typically truckers want to transport their product as quickly as possible and then pick up
another load in order to make more money. Tr. at 27.

---

[1] Similarly, Officer Lucero described a Level 2 safety inspection as including, "reviewing all the
paperwork, driver's license, medical card, registrations permits, bills of lading, which also includes a walk-around
of the commercial vehicle to check the lights, the horn, the windshield, the tires, exhaust, air lines. Also a sleeper
berth check, which includes making sure that the seats are bolted down, the seat belts are in working order, make
sure there's no holes in the floor board, emergency equipment. And then the last part of the inspection is a cargo
inspection, which we check for– making sure that it's securely braced and make sure that what the product is, is
matching the bills of lading." Tr. at 33.

The next entry in Mr. Neris's logbook on August 26, 2010, shows that he intended to travel from Kingman, Arizona to Maryland that day.  Ex. 14.  Officer Lucero said he did not understand how Mr. Neris got from Ontario to Kingman until he realized Mr. Neris had a co-driver.  Tr. at 28.   Mr. Neris's co-driver was not identified in his logbook as required by law.  According to the logbook, Mr. Neris left Kingman on August 26, 2010, at approximately 1:30 a.m.  However, he did not arrive at the Port of Entry in Gallup, New Mexico until approximately 9:45 a.m.   Officer Lucero testified that there was no change in Mr. Neris's duty status, indicating it took him  over eight hours to drive from Kingman to Gallup.  Tr. at 28.  Officer Lucero also found this "odd" because he said typically it takes about four hours to drive that distance.  *Id.*

Officer Lucero also testified that he reviewed the co-driver, Jose Vasquez's, logbook.  According to Officer Lucero, Mr. Vasquez's logbook indicated that he was off duty in Philadelphia from August 16 -24, 2010, including the period of Mr. Neris's trip.  Tr. at 29; 56-57.  The co-driver's logbook did not show any activity on August 25th and 26th, which is a violation for which Mr. Vasquez could have been ticketed if he had been driving at that time.  Tr. at 56-57.  Thus, Mr. Vasquez's logbook was also incorrect.  At some point, Officer Lucero also learned that Mr. Vasquez flew to California to drive back with Mr. Neris.  Tr. at 56.

After reviewing the logbooks, Officer Lucero began an inspection of the truck.  He noted that Mr. Neris's truck had only two IFTA stickers representing a fuel tax truckers must pay to cross the United States.  Tr. at 32; Ex. 3.  Officer Lucero said the significance of having only two stickers is that it shows the trucking company is a new company.  More established companies have several IFTA stickers indicating how long the company has been in business.  *Id.*  He also noted the name of the trucking company, J & J Trucking, on the side of the truck.  *Id.*  He then

inspected the bill of lading, which indicated Mr. Neris was transporting six packages weighing 7514 pounds from Rancho Dominguez, California to Waldorf, Maryland.  Tr. at 35; Ex. 15.  The packages were described on the bill of lading simply as "Used Crated Liftvans (HHG's)" with instructions on how to move them.  *Id.*  The shipping company was identified as GTO 2000, Inc. Tr. at 34; Ex. 15.   Officer Lucero saw that a seal had been placed on the truck that was not indicated on the bill of lading.  He testified that when a shipping company places a seal on its load, it includes this information on the bill of lading as well as the seal number to protect the integrity of the load.  Tr. at 35-37; Ex. 8.  According to Officer Lucero, Mr. Neris told him that the shipping company had put the seal on the truck, which Officer Lucero found "odd" because the bill of lading did not have a seal indicated on it and "usually the companies will put the seal number on there."  Tr. at 38.

In this case, Mr. Neris had a bolt style "J.J. Keller" seal on his truck.  Tr. at 36; Ex. 8. Officer Lucero explained that this is a common seal that anyone can purchase at a truck stop.[2] Tr. at 36.  He further explained that when a shipping company places a seal on a load, it typically uses one with their name on it.  Tr. at 37.  Once a seal is placed on a truck the only way to remove it is to cut it off, which he did here.  *Id.*  He stated that in order to inspect the cargo and verify that it matches the bill of lading, he is required to cut seals placed on trucks subject to inspection at the port of entry.  Tr. at 37-38.  When this is done, following completion of the inspection, he will replace the seal with a New Mexico Department of Public Safety seal, indicating the integrity of the load is still protected.  Tr. at 39.

---

[2] Later on cross-examination, defense counsel admitted as Defense Exhibit 1 a receipt found by a DEA agent showing Mr. Neris had purchased a high security bolt for $9.89 in Ontario, California.  Tr. at 65-67.  Officer Lucero testified that he had not seen the receipt before.  Tr. at 66.  While the receipt shows that Mr. Neris lied about the company placing the seal on the truck, this evidence was not part of what Officer Lucero considered in making his decision to open the crate.  Thus, it is not considered for purposes of establishing probable cause.

After cutting the seal, Officer Lucero entered the cargo area of the trailer.  He saw and counted six large plywood crates secured by metal load locks.[3]  Tr. at 40, 71.  In front of these crates, he saw a much smaller seventh plywood crate secured by a two-by-four drilled into the floor.  Tr. at 40-41, 71; Exs. 7, 9 & 10.  Officer Lucero  said the smaller crate was different from the rest of the crates.  Tr. at 41.  He explained the "larger crates had markings on them that they were for military, had military names and numbers on them."  Tr. at 41, 78.  He also said at the top of the large crates there was "white tape on every single of these large ones [crates] that said 'Property of the U.S. Government.'"  *Id.*  He observed that the smaller crate did not have any military markings or tape on it.  Tr. at 42, 45.  Furthermore, it had what appeared to be black spray paint around the edges.  Tr. at 42.  He also said the large crates were put together with nails, while the small crate was put together with wood screws.  Tr. at 45.

After Officer Lucero inspected the exterior of the crates, he asked Mr. Neris what was in his trailer.  Tr. at 42, 78.  Mr. Neris responded that he "was not aware what he was carrying."  Tr. at 42, *see* tr. at 78-79.  Mr. Neris also told Officer Lucero that he "believed the shipping company forgot to put the seal number on the bills" and advised Officer Lucero that he had the broker's telephone number to call to find out what was in the crates.  *Id.*  Officer Lucero then located and called the telephone number listed on the bill of lading for GTO 2000, Inc.  *Id.*; *see* Ex. 15.  He asked to speak with a woman named Lori who was identified on the bill of lading.  *Id.*  He identified himself as a police officer, advised her that he was doing an inspection of a shipment of theirs, and asked her if she could tell him how many crates she had shipped.  Tr. at

---

[3]  Officer Lucero testified that when he entered the trailer, he initially saw two large crates and one smaller crate in front, as depicted in Government Exhibits 9 and 10.  He then "stepped up on the little box" and "peer[ed] over the top" where he counted "four other crates behind the first two, which are located all the way to the front wall" of the truck.  Tr. at 70-71, 76-77, 90-91.

43.  He said she told him that GTO had shipped six large crates.  Tr. at 43, 81, 89.  He then asked her what was in the crates, and she responded, "military household goods."  Tr. at 43, *see* tr. at 81.  Officer Lucero also asked Lori "if the company had provided the driver with a seal."  *Id.* Lori responded, "[N]o, because it was a partial load.  This way, if the driver wanted to put some more product in there, they were able to."  *Id.*  Officer Lucero noted the load filled approximately one quarter of the trailer.  Tr. at 74; *see* Ex. 9.  Officer Lucero further testified that the fact that Mr. Neris had only a partial load, as well as a co-driver, did not make his trip economically beneficial based upon the price of gas, required truck maintenance and the cross country nature of the trip.  Tr. at 43-44.

After speaking with Lori, Officer Lucero asked Mr. Neris about the seventh crate and if he had any knowledge about it or its contents.  Tr. at 45.  Mr. Neris responded that he "had no idea what it was, that the shipper had loaded it."  *Id.; see* tr. at 84.  At that point, Officer Lucero decided to open the crate, stating, "I had no clue what was in that crate."  *Id.*  He then went into the port to retrieve a drill to remove the screws on the lid of the seventh crate.  While he was removing the screws, he testified that he "noticed Mr. Neris pacing back and forth at the rear of the trailer.  He was– it was just making me real uncomfortable that he was pacing back and forth. I have no clue what he was doing, I don't know who he is."  Tr. at 46.  At that point, Officer Lucero asked Mr. Neris to step into the trailer and hold the screws as he removed them, in order to keep him occupied.  *Id.*  When Officer Lucero opened the seventh crate, he saw what he believed to be "illegal narcotics."  Tr. at 47; Ex. 12.  It was later determined that the seventh crate contained 71 bundles of cocaine weighing approximately one kilogram each.  Gov. Resp. at 1.

# II. ANALYSIS

## A.    Standing

The government claims Mr. Neris lacks standing to challenge the inspection of the crate containing cocaine.  The government argues Mr. Neris did not have a subjective or reasonable expectation of privacy in the area searched or the items seized.  The government points out that at no time did Mr. Neris tell Officer Lucero that he owned the truck, nor was any such evidence introduced at the hearing.  Moreover, when asked about the crate at issue, Mr. Neris told Officer Lucero he did not put it in the truck or know what was in it, thus disclaiming any ownership or privacy interest in it.

"In order to challenge the lawfulness of a search and seizure under the Fourth Amendment, a defendant must first establish his or her standing to do so."  *United States v. Marchant*, 55 F.3d 509, 512 (10th Cir. 1995) (citing *United States v. Deninno*, 29 F.3d 572, 576 (10th Cir. 1994)).  "Consequently, 'a threshold issue in deciding a motion to suppress evidence is whether the search at issue violated the rights of the particular defendant who seeks to exclude the evidence.'"  *Id.* at 513 (quoting *United States v. Soto*, 988 F.2d 1548, 1552 (10th Cir. 1993) (citation omitted)).  In order for a defendant to have standing under the Fourth Amendment to challenge the constitutionality of a search, he must first demonstrate that he has a subjective expectation of privacy in the object or area searched.  *United States v. Kopp*, 45 F.3d 1450, 1452-53 (10th Cir. 1995) (citing *United States v. Betancur*, 24 F.3d 73, 76 (10th Cir. 1994) (citing *Rakas v. Illinois*, 439 U.S. 128, 140, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978))).  He then must demonstrate that his expectation is one society would recognize as objectively reasonable.  *Id.* (citations omitted).

7

When considering the first prong of this test, "[a] court must look at all the facts and circumstances to determine whether [a] defendant's subjective expectation of privacy is legitimate." *United States v. Abreu*, 935 F.2d 1130, 1133 (10th Cir. 1991) (citing *United States v. Salvucci,* 448 U.S. 83, 91-93, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980)).  "Important considerations include ownership, lawful possession, or lawful control of the place searched." *Id.* (citations omitted).  Here, Mr. Neris did not tell or otherwise demonstrate to Officer Lucero that he owned the truck, nor was any such ownership evidence presented at the hearing.  Thus, at the time of the inspection, Mr. Neris's ownership interest, if any, in the truck was unknown to Officer Lucero.  Furthermore, Mr. Neris stipulated that Officer Lucero had regulatory authority to open and enter the trailer as part of his inspection.  Therefore, he is not asserting a privacy interest with respect to the trailer, only its contents.  However, Mr. Neris also falsely told Officer Lucero that the trailer had been loaded and sealed by the shipper, thus indicating that Mr. Neris did not control access to the trailer or claim ownership or control over its contents.  *See Kopp*, 45 F.3d at 1452 (finding truck owner did not have standing to challenge search of attached U-Haul trailer in which marijuana was found because he did not own, rent or control access to the trailer); *Abreu*, 935 F.2d at 1133 (finding defendant had no privacy interest in trailer searched despite owning the tractor to which it was attached); *see also United States v. Jefferson,* 925 F.2d 1242, 1249 (10th Cir. 1991) (mere possession and control of a vehicle is not alone sufficient to establish a right of privacy in the vehicle (citations omitted)).

Furthermore, the more damaging evidence to Mr. Neris's asserted privacy interest is the fact that he disclaimed any interest in or knowledge about the crate or its contents.  He told Officer Lucero that the shipper had put the seventh crate in the trailer and he had "no idea" what it was.  Tr. at 45, 84.  He was clearly attempting to distance himself from the crate and its

contents– the cocaine.  In this context, the Tenth Circuit has held that such a disclaimer of interest is similar to abandonment.  *See United States v. Garzon*, 119 F.3d 1446, 1449 (10th Cir. 1997) ("Abandonment is akin to the issue of standing because a defendant lacks standing to complain of an illegal search . . . of property which has been abandoned.").

In *United States v. Denny*, 441 F.3d 1220, 1226 (10th Cir. 2006), the Tenth Circuit addressed the issue of a defendant's standing to challenge the search of a plastic bag containing marijuana when he expressly disclaimed any ownership interest in the bag.  In *Denny*, the defendant placed a plastic bag with a cracker box containing marijuana in it under his seat on a train to avoid detection by the police.  When asked if he owned it, he denied having any knowledge about the bag.  The Tenth Circuit held this disclaimer of interest constituted abandonment of the bag, and as such, the defendant "relinquished any reasonable expectation of privacy in its contents."  *Id.* at 1228.  Therefore, the Tenth Circuit held that because the defendant abandoned the bag, he had no standing to challenge the search.  *Id.* at 1229; *see also United States v. Burbage*, 365 F.3d 1174 (10th Cir. 2004) (holding defendant had no reasonable expectation of privacy in backpack he told DEA agent he did not own).  The holding in *Denny* is consistent with other circuit decisions regarding similar issues.  *See id.* at 1227 (citing *United States v. Zapata*, 18 F.3d 971, 978 (1st Cir. 1994) ("disclaiming ownership is tantamount to declaring indifference, and thus negates the existence of any privacy concern in a container's contents") (internal citations omitted); *accord United States v. Frazier*, 936 F.2d 262, 265 (6th Cir. 1991) (holding verbal disclaimer of ownership constituted abandonment of bag); *United States v. Lewis*, 287 U.S. App. D.C. 306, 921 F.2d 1294, 1302 (D.C. Cir. 1990) (explaining "voluntary denial of ownership demonstrates sufficient intent of disassociation to prove abandonment"); *Bond v. United States*, 77 F.3d 1009, 1013 (7th Cir. 1996) (same)); *see also*

9

*United States v. Torres*, 949 F.2d 606, 608 (2$^d$ Cir. 1991) (noting "an otherwise legitimate privacy interest may be lost by disclaiming or abandoning property, especially when actions or statements disavow any expectation of privacy"). Consequently, Mr. Neris has failed to demonstrate that he has a subjective expectation of privacy in the crate at issue and its contents, and therefore lacks standing to challenge Officer Lucero's search of the crate.

Finally, having found Mr. Neris has failed to satisfy the first requirement for standing, the Court need not determine the second requirement. However, even a cursory examination of the issue would support a finding that society would not recognize as objectively reasonable Mr. Neris's expectation of privacy in the crate at issue. In *Kopp*, the Tenth Circuit held that society would not recognize as objectively reasonable an expectation of privacy in a U-Haul trailer. 45 F.3d at 1452. The circumstances in this case are even more compelling than in *Kopp* given that the trailer and cargo at issue here are commercial in nature, not personal, and are subject to inspection under state and federal law. Inspection of commercial cargo is necessary to protect society from unsafe conditions and harmful materials passing through our states. Therefore, Mr. Neris also has failed to establish the second requirement for standing to challenge Officer Lucero's search of the crate.

**B.      Search of Crate**[4]

In *United States v. Vasquez-Castillo*, 258 F.3d 1207, 1210 (10th Cir. 2001), the Tenth Circuit upheld New Mexico's regulatory scheme for conducting warrantless inspections of commercial trucks at its ports of entry pursuant to the three-part test articulated in *New York v.*

---

[4] While this Court finds Mr. Neris does not have standing to challenge the search of the crate and seizure of the cocaine; even if he did have standing, the facts in this case support a finding that he was legally authorized to search the crate containing cocaine.

*Burger*, 482 U.S. 691, 703, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987).  Under New Mexico's

regulatory scheme, the Tenth Circuit has held that an officer may permissibly enter the trailer of

a commercial vehicle to inspect blocking and bracing, *Vasquez-Castillo*, 258 F.3d at 1212; and

to inspect the cargo and contents of the trailer.  *United States v. Gwathney*, 465 F.3d 1133, 1139-

40 (10th Cir. 2006) (citing N.M. Stat. Ann. § 65-5-1(F) as imposing regulatory duty to inspect

contents of trailer).  In accordance with this authority, Mr. Neris stipulates that Officer Lucero

was authorized to enter the trailer while conducting the Level 2 inspection.  The dispute here is

whether, once inside the trailer, Officer Lucero had authority to open the small crate and inspect

its contents.

   The government contends that under New Mexico's regulatory authority, Officer Lucero

was authorized to open the crate to inspect its contents, citing N.M. Stat. Ann. § 65-5-1(F) which

authorizes inspection of "the vehicle *and its contents* to determine whether all laws and all rules

and regulations of the departments of this state with respect to public safety, health, welfare and

comfort have been fully complied with."  (Emphasis added); *see* N.M. Stat. Ann. § 65-5-1(D)

(inspector "may confirm the contents of the cargo"); N.M. Stat. Ann. § 65-5-1(E) (inspector

"may inspect the contents of the vehicle").  The government argues this statutory language not

only authorizes, but requires Officer Lucero to open the crate when he cannot otherwise

determine its contents.  Gov. Resp. at 10-11.  It asserts that without opening the unidentified,

unmarked, sealed crate, Officer Lucero could not comply with the statutory mandate to inspect

the cargo to ensure its compliance with state and federal law.  *Id.*  Mr. Neris disagrees, arguing

Officer Lucero needed probable cause, which he did not have, to open the crate.

   While this Court finds the government's argument compelling, the Tenth Circuit has thus

far ended the analysis when probable cause to search exists.  In *Gwathney*, the Tenth Circuit

11

determined it, "need not decide if New Mexico's regulatory scheme authorized the actual

opening of boxes, because we agree with the district court that on the facts in this record, Officer

Smid had probable cause to inspect the non-conforming packages for contraband after

permissibly entering the trailer to inspect the cargo, blocking and bracing."  465 F.3d at 1140.

Likewise, here the Court finds Officer Lucero had probable cause to open the small crate,

therefore it need not determine whether he also had regulatory authority to do so.  *See id*; *see*

*also United States v. Diaz*, 356 Fed.Appx. 117, 123-24 (10th Cir. 2009) (unpublished) (finding

officer had probable cause to further search contents of trailer)*; Vasquez-Castillo*, 258 F.3d at

1212-13 (finding officer had probable cause to search secret compartment in trailer).

   "Probable cause to search a vehicle is established if, under the totality of the

circumstances, there is a fair probability that the car contains contraband or evidence."  *Vasquez-*

*Castillo*, 258 F.3d at 1212 (quoting *United States v. Downs*, 151 F.3d 1301, 1303 (10th Cir. 1988)

(internal quotation marks and emphasis omitted)).  An officer's subjective intentions or state of

mind plays no role in the probable cause analysis.  *See Ohio v. Robinette*, 519 U.S. 33, 38, 117

S.Ct. 417, 136 L.Ed.2d 347 (1996) (citing *Wren v. United States*, 517 U.S. 806, 116 S.Ct. 1769,

135 L.Ed.2d 89 (1996)).  Here, Officer's Lucero's testimony was credible and uncontradicted.

The following facts made known to Officer Lucero provided him with sufficient probable cause

to open the small crate in which the cocaine was found: 1) Mr. Neris's off-duty status after

picking up the load in California was unusual for a trucker needing to transport his cargo as

quickly as possible to make money; 2) Mr. Neris's failure to identify his co-driver on his

logbook as required by law; 3) the failure of either Mr. Neris's or his co-driver's logbooks to

include the period of time in which they traveled from Ontario, California to Kingman, Arizona;

4) the co-driver's logbook indicating he was off-duty in Philadelphia with no additional

information reported for the period at issue; 5) the unusually long period of time (over eight

hours) it took Mr. Neris to drive from Kingman, Arizona to Gallup, New Mexico (a four-hour

trip); 6) a seal was placed on the trailer that was not identified on the bill of lading; 7) Mr. Neris

said the seal was placed on the truck by the shipper, yet the seal did not have the shipper's name

on it as is common practice for shippers to use; 8) the J.J. Keller seal on the trailer can be

purchased at most truck stops; 9) the shipper denied placing a seal on the trailer because it was

only shipping a partial load; 10) Officer Lucero's knowledge that transporting only a partial load

with a co-driver cross-country is not typically economically viable; 11) the bill of lading stated

the shipper placed six packages in the trailer, yet there were seven crates in the trailer; 12) the

shipper confirmed on the telephone that it had placed only six crates on the trailer, identifying

them as "large" crates containing military household goods; 13) the seventh crate was

significantly smaller than the six other large crates of roughly equal size; 14) the seventh,

smaller crate did not have the same markings as the six large crates; 15) the seventh, smaller

crate was not sealed in the same manner as the six large crates; 16) Mr. Neris's statement that the

shipper placed the small crate on the trailer was inconsistent with the shipper's statement; and

17) Mr. Neris denied any knowledge about the seventh, smaller crate.  The totality of these

circumstances indicate there was a fair probability that the small, non-conforming seventh crate

contained contraband.  Therefore, the Court finds that Officer Lucero's presence within the

trailer was within the permissible scope of a warrantless regulatory search.  The Court further

finds that the facts known to Officer Lucero established probable cause for him to search the

seventh crate containing cocaine.

IT IS THEREFORE ORDERED that Defendant's Motion to Suppress Physical Evidence

(Doc. 27) is DENIED.

Dated: July 11, 2011.

_____
MARTHA VAZQUEZ
UNITED STATES DISTRICT JUDGE

14